UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BLUETEAM ROOFING, LLC, ET AL.                  CIVIL ACTION

VERSUS                                          NO. 23-931

VINCENT PIAZZA JR. & SONS                       SECTION "O"
SEAFOOD, INC.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.    INTRODUCTION

This case arises out of a contractual dispute between Plaintiff Sendero Restoration Services, LLC ("Sendero") and Defendant Vincent Piazza Jr. & Sons Seafood, Inc. ("Piazza"). On March 15, 2023, Sendero's subcontractor, co-Plaintiff BlueTeam Roofing, LLC ("BlueTeam"), filed this action against Piazza, asserting a claim for breach of contract and a claim in the alternative for unjust enrichment.[1] The complaint was later amended to include Sendero as a plaintiff.[2] According to Plaintiffs, Piazza elected to terminate the parties' agreement without the "good cause" required under the contract, triggering a liquidated damages provision.[3] Plaintiffs seek liquidated damages of $566,791.35 for their breach of contract claim and attorneys' fees.[4] Plaintiffs also assert a claim in the alternative for unjust enrichment for the materials and services provided to Piazza for which Plaintiffs were allegedly not paid.[5]

---

[1] ECF No. 1.
[2] ECF Nos. 14, 35; ECF No. 96 Uncontested Material Facts, r-v.
[3] ECF No. 35 ¶¶ 20-21.
[4] ECF No. 35 ¶¶ 22-26.
[5] Id. ¶¶ 27-31.

From January 20-21, 2026 the Court held a bench trial. The Court has carefully considered the testimony of all witnesses and the exhibits entered into evidence during the trial, as well as the record in this matter. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court enters the following Findings of Fact and Conclusions of Law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent any conclusion of law may be construed as a finding of fact, the Court hereby adopts it as such.

## II.    FINDINGS OF FACT

1.    Plaintiff Sendero is a general contractor specializing in commercial restoration, roofing, and exterior repairs. Co-Plaintiff BlueTeam is a contractor specializing in commercial roofing repair and replacement.[6]

2.    Piazza is a wholesale seafood distributor with a facility in Elmwood, Louisiana.[7] Piazza's facilities were damaged during Hurricane Ida in 2021.[8]

3.    On or about September 14, 2021, Sendero and Piazza entered into a contract titled the "Restoration Services Agreement" (the "Restoration Contract").[9]

4.    Under the Restoration Contract, Piazza gave Sendero "exclusive rights" to repair its property. Sendero in turn agreed to provide repair services as outlined therein.[10] Respecting the scope of the services, Piazza "affirm[ed] that Sendero will

---

[6] ECF No. 96 at 2 (Joint Pretrial Order).
[7] *Id.* Uncontested Material Facts, a.
[8] *Id.* Uncontested Material Facts, b.
[9] *Id.* Uncontested Material Facts, c.
[10] Pl. Ex. 1 (Restoration Contract).

have the right per this Agreement to perform all the work associated with [Piazza's] primary building and primary building roof[.]"[11]

5.    Discussions occurred between Piazza's Chief Financial Officer, Ms. Barbara Hirsch ("Ms. Hirsch"), and Sendero's Manager, Mr. Ned Vaughn Scott ("Mr. Scott"), before the signing of the Restoration Contract. The parties negotiated several of the contract's provisions and exchanged drafts before signing the operative contract.[12]

6.    In an earlier draft of the Restoration Contract, Piazza proposed language that would enable it to "reserve[] the right to limit the amount of work to be done [by Sendero] based upon current needs and future expansion plans." However, "[a]t no time will the amount of work to be designated to Sendero for repairs be less than 30% of the overall total of the insurance settlement."[13]

7.    Sendero rejected the inclusion of this provision. Mr. Scott testified that 30% of Piazza's future insurance settlement would not cover the cost of the repairs Sendero would need to perform to repair Piazza's roof and building.[14] The provision ultimately was not included in the final, signed draft of the Restoration Contract.[15]

8.    Several sections of the executed Restoration Contract are relevant to this dispute. In particular:

---

[11] *Id.* § 1.
[12] Testimony of Vaughn Scott; Testimony of Barbara Hirsch; Pl. Ex. A (Executed Restoration Contract); Pl. Ex. B (Draft Restoration Contract).
[13] Pl. Ex. B; Testimony of Vaughn Scott;
[14] Testimony of Vaughn Scott.
[15] Pl. Ex. A; Testimony of Barbara Hirsch; Testimony of Vaughn Scott.

9.    The Work: In Section 1 of Restoration Contract, Piazza agreed that Sendero

> will have the right per this Agreement to perform all the work associated with the primary building and primary building roof with the exception of the refrigeration which will require negotiation with the Company's preferred vendor.[16]

10.    Initial Evaluation: Section 1.1 of Restoration Contract provided that

> Sendero will investigate and evaluate all of the damages to the Subject Property and will provide [Piazza] and [Piazza's] insurance carrier with the estimate of a) the scope of work and b) the costs attendant to such work. This estimate will encompass the work and costs needed to return the Subject Property to its condition prior to the damages.[17]

11.    Payment: Section 2 of the Restoration Contract provided that the "amount payable to Sendero . . . is defined as the 'Agreed Amount' and is ascertained by reference to the insurance carrier's damage calculations and other Agreement Documents."[18] The contract provided for a staggered payment schedule that would require Piazza to pay proportions of the "Agreed Amount" as Sendero began and progressed its work on the project.[19]

12.    Assignment and Subcontracting: Section 7 of the Restoration Contract permitted Sendero to "sub-contract services provided hereunder without prior written consent of [Piazza]." Neither party, however, was permitted to assign the contract without the prior written consent of the other party, "which shall not be

---

[16] Pl. Ex. 1 § 1.
[17] *Id.* § 1.1.
[18] *Id.* § 2.
[19] *Id.* § 2.1.

unreasonably withheld or delayed."[20] Mr. Scott testified that it was important to Sendero, as a general contractor, to have the ability to subcontract the work to its subcontractors without requiring permission from the client.[21]

13.    Termination of Agreement: Section 6.1 permitted Piazza to elect to terminate the Restoration Contract "if good cause is determined, such as in the event that Sendero substantially breaches the terms of this Agreement."[22]

14.    Liquidated Damages: Section 6.1 also provided that if Piazza

cancels this Agreement, without good cause, the Parties agree that Sendero would be entitled to liquidated damages for its out-of-pocket expenses and lost profits. The Parties agree that a reasonable liquidated damages amount would be forty-five percent (45%) of the Agreed Amount of this Agreement.[23]

15.    In a prior draft of the Restoration Contract, Piazza proposed a liquidated damages provision of 25% of the Agreed Amount.[24] Sendero rejected this percentage and proposed 45%. Mr. Scott testified that 25% liquidated damages would not cover the cost to do the work. The parties ultimately agreed to a 45% liquidated damages provision in the executed version of the Restoration Contract.[25]

16.    Governing Law: Section 8 provided that the Restoration Contract shall be "governed by, construed, enforced in accordance with" Texas law.[26] The parties

---

[20] *Id.* § 7.
[21] Testimony of Vaughn Scott.
[22] *Id.* § 6.1.
[23] *Id.*
[24] Testimony of Vaughn Scott; Pl. Ex. B § 6.1.
[25] Testimony of Vaughn Scott; Pl. Ex. A § 6.1.
[26] *Id.* § 8.

have jointly stipulated Texas law shall govern the dispute between Piazza and Sendero.[27]

17.     A few weeks after the parties signed the Restoration Contract, Sendero prepared an initial estimate valuing Piazza's hurricane-related damage at $1,192,468.13.[28] Sendero later prepared a revised estimate dated December 3, 2021 valuing the damages at $1,287,246.15.[29]

18.     By letter dated October 29, 2021, Piazza's insurer—Certain Underwriters at Lloyd's, London—through its adjuster, Minuteman Adjusters, advised Piazza that it valued the loss at merely $291,229.30. Minuteman Adjusters subsequently issued an initial payment to Piazza of $210,116.57. Piazza deposited the $210,116.57 payment into its account on or about November 12, 2021.[30]

19.     Piazza disputed Minuteman Adjusters' initial valuation of $210,116.57. Sendero and Piazza did not schedule any work to begin on Piazza's roof at this time because that amount was not enough to cover the damages to the property.[31]

20.     In December 2021, Sendero sold certain assets to co-plaintiff BlueTeam. BlueTeam was to be responsible for any new construction projects going forward. As part of that transaction, however, Sendero was left in place as an entity to fulfill its existing contractual obligations. Once Sendero's existing contractual obligations were complete, Sendero was to dissolve.[32]

---

[27] ECF No. 44 ¶ 2 (Joint Pretrial Stipulations).
[28] ECF No. 96 Uncontested Material Facts, d; Pl. Ex. E at 22.
[29] ECF No. 96 Uncontested Material Facts, d; Pl. Ex. H at 30.
[30] ECF No. 96 Uncontested Material Facts, e-f; Pl. Ex. F.
[31] ECF No. 96 Uncontested Material Facts, g; Testimony of Vaughn Scott.
[32] Testimony of Vaughn Scott.

21.     Certain of Sendero's existing contracts were carved out from BlueTeam's purchase of Sendero's assets, including the Restoration Contract. As permitted under the Restoration Contract, Sendero engaged BlueTeam as a subcontractor to assist with Piazza's insurance claim and perform the repair work to Piazza's facility.[33] Sendero thus remained ultimately responsible for performance under the Restoration Contract, although the actual work was to be performed by its subcontractor, BlueTeam.[34]

22.     In January 2022, Piazza and BlueTeam began regularly exchanging emails regarding the insurance claim, documentation, scope, and appraisal strategy. From January through November 2022, Piazza exchanged approximately 50 emails with BlueTeam.[35]

23.     In March 2022, BlueTeam recommended that Piazza retain third-party appraiser Ray Demerritt to assist with Piazza's insurance claim. Piazza's insurance policy provided for an appraisal process in the event the policyholder and insurer disagreed on the amount of the loss. The policy provided that each party would appoint an impartial appraiser. If the appraisers could not agree on the amount of loss, an umpire would decide the amount of the loss. The umpire's decision would be binding on all parties.[36]

---

[33] Pl. Ex. 1 § 7 (Section 7 of the Restoration Contract permits Sendero to "sub-contract services provided hereunder without prior written consent of Customer."); Testimony of Vaughn Scott.

[34] Testimony of Vaughn Scott; ECF No. 99 at 15 (Order & Reasons on Cross-Motions for Summary Judgment).

[35] Testimony of Vaughn Scott; Pl. Ex. K (Blueteam-Piazza emails).

[36] ECF No. 96 Uncontested Material Facts, h-i.

24.     In May 2022, when Piazza's insurer still had not approved the full claim value, BlueTeam again recommended that Piazza retain Mr. Demeritt.[37] BlueTeam explained that the cost of the appraiser would come out of the total award and thus would not cost Piazza any additional funds. Piazza agreed to use Mr. Demeritt as an appraiser.[38]

25.     BlueTeam provided Mr. Demeritt with photographs, measurements, estimates, and other materials supporting Piazza's damages claim.[39]

26.     Piazza's insurance claim proceeded to appraisal, and an umpire was appointed.[40]

27.     On November 8, 2022, the umpire signed an "Appraisal Award" valuing Piazza's total claim value at $1,229,598.96.[41] Piazza was satisfied with this amount.[42]

28.     In a letter dated December 7, 2022, the adjuster for Piazza's insurer, Minuteman Adjusters, acknowledged the Appraisal Award. Minuteman Adjusters advised it would issue a supplemental payment of $967,482.39. When combined with the prior payment of $210,116.57 and Piazza's $52,000 deductible, that total equaled $1,229,598.96.[43]

---

[37] Testimony of Vaughn Scott; Testimony of Barbara Hirsch; Pl. Ex. K-32.
[38] ECF No. 96, Uncontested Material Facts, h; Testimony of Vaughn Scott; Testimony of Barbara Hirsch.
[39] Pl. Ex. AA; Testimony of Vaughn Scott.
[40] ECF No. 96 Uncontested Material Facts, j.
[41] *Id.* Uncontested Material Facts, k.
[42] *Id.* Uncontested Material Facts, l.
[43] *Id.* Uncontested Material Facts, m.

29.   Minuteman Adjusters issued Piazza a check in the amount of $967,482.39, dated December 7, 2022.[44] Piazza received the check sometime around the end of December.[45]

30.   According to Mr. Scott, Piazza never told BlueTeam about the appraisal award. Rather, the appraiser, Mr. Demeritt, informed BlueTeam about the final award of $1,229,598.96.[46]

31.   Barbara Hirsch testified that after she received the check from Minuteman for $967,482.39, BlueTeam pressured her to turn over the entire check to BlueTeam.[47]

32.   Mr. Scott disputed Ms. Hirsch's testimony. He testified that BlueTeam did not pressure Piazza to turn over the entire check because the Restoration Contract called for a staggered payment schedule.[48]

33.   The Court considers Mr. Scott's testimony credible on this issue and finds that BlueTeam did not pressure Piazza to turn over the entire check. The Restoration Contract supports Mr. Scott's testimony insofar as it shows the parties agreed to a staggered payment schedule. For example, only the first 30% of the Agreed Amount would be paid by Piazza to Sendero "upon mobilization of the work" and the final 10% of the Agreed Amount would be paid upon Piazza's "final inspection" of the completed repair work.[49] Further, Ms. Hirsch explained that Piazza

---

[44] *Id.* Uncontested Material Facts, n.
[45] Testimony of Barbara Hirsch.
[46] Testimony of Vaughn Scott.
[47] Testimony of Barbara Hirsch.
[48] Testimony of Vaughn Scott.
[49] Testimony of Vaughn Scott; Testimony of Barbara Hirsch; Pl. Ex. A § 2.1 ("

ultimately used the check—which was made out to Piazza—as a curtailment on their mortgage loan.[50]

34.    After issuance of the November 8, 2022 Appraisal Award, Plaintiffs began to order materials for its upcoming work repairing Piazza's roof.[51]

35.    After learning of the successful appraisal award and receiving the insurance check, Piazza sought to delay the project's start. Ms. Hirsch and Mr. Piazza testified that they were not ready for BlueTeam to repair the roof because they had additional questions and concerns. Ms. Hirsch testified that she believed Mr. Scott was not interested in trying to understand Piazza's concerns or answer her questions. Instead, she felt he was only trying to push the contract forward.[52]

36.    Mr. Scott disputed this account. He testified that neither he nor his team ever received questions from Piazza that went unanswered or that prevented scheduling the work. Several exhibits support Mr. Scott's testimony. These include emails from BlueTeam contemporaneously offering to answer any questions that Piazza had or to discuss any issues throughout November 2022 to January 2023.[53] For example, in January 2023, Mr. Scott offered to have a second preconstruction meeting with Piazza to discuss the upcoming repair work and answer any questions.[54] Ms. Hirsch testified that she could not name a specific communication or example of a question that went unanswered by BlueTeam.[55]

---

[50] Testimony of Barbara Hirsch.
[51] Testimony of Vaughn Scott; Pl. Ex. DD; Pl. Ex. K50; Pl. Ex. R.
[52] Testimony of Barbara Hirsch; Testimony of Brian Piazza.
[53] *See, e.g.*, Pl. Ex. K-46, K-49, K50, Ex. P.
[54] Pl. Ex. R.
[55] Testimony of Barbara Hirsch.

37. According to Mr. Piazza, Piazza's relationship with Sendero/BlueTeam began to fall apart when a BlueTeam representative attended an in-person meeting at Piazza's facilities in late 2022. Mr. Piazza and Ms. Hirsch testified that the BlueTeam representative was pushy and rude. The representative attempted to have them schedule the repair work and told them that BlueTeam had ordered supplies for the project.[56]

38. Mr. Pizza testified that after that meeting, he began reaching out to other roofing companies. According to Mr. Piazza, other companies informed him that BlueTeam was overcharging Piazza for the cost of the repairs. The other companies told Mr. Piazza they would do the same work for far cheaper.[57]

39. Ms. Hirsch also testified that she had issues with certain people she was dealing with around the time the appraisal had concluded, specifically, Mr. Scott. Ms. Hirsch had initially thought Mr. Scott would only be involved in the contract negotiations, and not in the actual repair work. Ms. Hirsch felt Mr. Scott was pushy and dismissive. Ms. Hirsch testified that she preferred to work with another Sendero/BlueTeam member, Cy Bellamy, who had left BlueTeam at some point in 2022 due to his wife's illness. She also enjoyed working with another representative, Ryan Cowles,[58] who also left the company at some point in 2022. Ms. Hirsch confirmed, however, that she did not have an issue with BlueTeam doing the repair

---

[56] Testimony of Brian Piazza.

[57] Testimony of Brian Piazza.

[58] Ms. Hirsch could not remember Ryan's last name. Ryan Cowles is cc'd on several emails between Sendero and Piazza. The Court assumes this is the person Ms. Hirsch is referring to. *See* Pl. Ex. J.

work on Piazza's facilities; rather, her issues were specifically with Mr. Scott and the pushy representative at the meeting in late 2022.[59]

40.    On January 5, 2023, Mr. Piazza emailed Ms. Hirsch and his brother, Nicholas Piazza. The email stated:

> Blue Team called asking about roof. I told them we were still looking over a few things. In so many words, they said that there really is nothing to look over. We have a signed contract. I told them we are looking closer at contract in regards to our rights. He then said that they are not just going away. They had a contract with us.
>
> We need to give contract to lawyer to look over asap to see our rights, or we need to decide what else to do.
>
> He said that he will be calling back tomorrow and Monday, but we need to get rolling.[60]

41.    Mr. Scott testified that he recalled the January 5, 2023 phone call with Mr. Piazza referenced in the email. Mr. Scott confirmed that the email accurately reflected the discussion on the call. According to Mr. Scott, Piazza did not share any specific issues it had with BlueTeam during the call.[61]

42.    According to Mr. Piazza, at this point, Piazza was not necessarily looking to exit the contract. Rather, they needed time and were anxious about Plaintiffs' personnel changes on the project. Ms. Hirsch testified that on the call, Mr. Scott threatened to sue if Piazza did not honor the contract, but Piazza was not looking to cancel the contract at that time.[62]

---

[59] Testimony of Barbara Hirsch.
[60] Pl. Ex. Q.
[61] Testimony of Vaughn Scott.
[62] Testimony of Barbara Hirsch.

43.    A little over a week later, on January 13, 2023, the parties had another telephone call. Mr. Scott testified that Ms. Hirsch, Brian Piazza, and Nicholas Piazza told him they had no obligation to use BlueTeam for the repair job and were cancelling the Restoration Contract. According to Mr. Scott, the Piazza team did not give a reason for the termination.[63]

44.    Mr. Scott emailed the BlueTeam CFO and an attorney for BlueTeam immediately after the call with Piazza. The subject line of the email read: "Vincent Piazza Seafood – Breaking Contract." Mr. Scott's email stated:

> Vincent Piazza has gone sideways and they are now saying they have no obligation to use us. I am just off a conference call with the two owners and the CFO. We have worked on this project for over a year and finally had successful outcome with the carrier. Please find attached the agreement in place with Piazza. Section 6.1 has the 45% liquidated damages fee. We need to get a letter out to them asap and I do not want to let this one go. I would like to pursue this to the fullest extent possible.[64]

45.    Ms. Hirsch and Mr. Piazza disputed Mr. Scott's characterization of the January 13, 2023 call. According to their testimony, they did not cancel the contract on that call.[65]

46.    On January 18, 2023, BlueTeam's attorney sent a letter to Piazza (the "Demand Letter"). The Demand Letter stated that BlueTeam was ready to proceed with the work on Piazza's roof but that "without cause, [Piazza] ha[s] informed [BlueTeam] that [it] wish[es] to terminate the Contract." The letter reminded Piazza

---

[63] Testimony of Vaughn Scott.
[64] Pl. Ex. S.
[65] Testimony of Barbara Hirsch; Testimony of Brian Piazza.

of the 45% liquidated damages provision for cancellation without good cause. The letter demanded Piazza withdraw its termination and schedule the repair work within 10 days.[66]

47.    The Court credits Mr. Scott's testimony and finds the evidence shows Piazza terminated the contract on the January 13, 2023 call. The Court found Mr. Scott's testimony on this issue more credible than Ms. Hirsch's and Mr. Piazza's in part due to Mr. Scott's demeanor and directness when answering questions. This contrasted with Ms. Hirsch and Mr. Piazza, who appeared more evasive. Mr. Scott's testimony is also supported by several contemporaneous pieces of evidence: (i) Mr. Scott's email with the subject line "Vincent Piazza – Breaking Contract" to BlueTeam's attorney and CFO shortly after the January 13, 2023 call; (ii) BlueTeam's attorney's January 18, 2023 demand letter stating Piazza had informed BlueTeam it wished to cancel the contract; and (iii) Mr. Piazza's January 5, 2023 email indicating Piazza was "looking closer at the contract in regards to [its] rights" and would "need to decide what else to do."

48.    The Court does not find credible Mr. Piazza's or Ms. Hirsch's testimony that they did not cancel the contract on the January 13, 2023 call. Neither Mr. Piazza nor Ms. Hirsch had a straightforward or believable explanation as to why Mr. Scott thought Piazza had cancelled the contract on January 13th. According to the January 18, 2023 Demand Letter, Mr. Scott was still interested in giving Piazza the opportunity to revoke its termination and to move forward with the work.[67] Mr.

---

[66] ECF No. 96 Uncontested material facts, o; Pl. Ex. U.
[67] Pl. Ex. U.

Piazza, by contrast, testified that by this point he had already contacted other roofing companies and had discovered he could get a better price with a different company. Ms. Hirsch also testified that Piazza was interested in using the insurance money in conjunction with an expansion of Piazza's facilities, even though this was not a part of the Restoration Contract.[68] Notably, this ability to use the insurance money to expand Piazza's other facilities—and not just for the primary building roof repair— was a draft provision in the Restoration Contract that was proposed by Piazza and rejected by Sendero.[69]

49.    The Court thus concludes the weight of the evidence supports the finding that Piazza cancelled the Restoration Contract on January 13, 2023.

50.    In addition to asserting that Piazza had cancelled the Restoration Contract, the January 18, 2023 Demand Letter also stated: "This law firm represents BlueTeam Roofing, LLC f/k/a Sendero Restoration Services, LLC (hereafter 'BlueTeam)." In a footnote, the letter explained: "After the contract was entered into, Sendero was purchased by BlueTeam Roofing, LLC, whereupon BlueTeam became the owner of and successor in interest to Sendero. Sendero now operates under the BlueTeam name."[70]

51.    Ms. Hirsch testified that Piazza only decided to cancel the contract after it received the January 18, 2023 letter. According to Ms. Hirsch, she had an internal meeting on January 20, 2023 with Brian Piazza and Nicholas Piazza. In that meeting,

---

[68] Testimony of Vincent Piazza; Testimony of Barbara Hirsch.
[69] Testimony of Vaughn Scott; Testimony of Barbara Hirsch; Pl. Ex. A (Restoration Contract); Pl. Ex. B (Prior Draft).
[70] ECF No. 96 Uncontested Material Facts, o.

the group agreed to contact an attorney and discuss whether to cancel the contract. According to Ms. Hirsch, after speaking with an attorney, Piazza decided to cancel the contract.[71]

52.    Piazza responded to the January 18, 2023 Demand Letter on February 1, 2023, in a letter authored by its attorney, Dayal Reddy (the "Response Letter").[72]

53.    In the Response Letter, Piazza stated it did "not believe there is any privity of contract between [Piazza] and BlueTeam Roofing, LLC" because Piazza had a contract "with Sendero Roofing, LLC." The Response Letter explained that Piazza's contract with Sendero "specifically require[d] written consent prior to assignment of the contract" and that "[n]o prior written consent has been provided or suggested thus far from Sendero." In the letter, Piazza took the position that "no contract exists" between Piazza and "Sendero and/or Blue Team."[73]

54.    Ms. Hirsch testified that this language in the February 1, 2023 Response Letter expressed, for the first time, Piazza's termination of the Restoration Contract.[74]

55.    Plaintiffs did not receive this Response Letter until it was filed into the record with Piazza's April 25, 2023 Answer.[75]

56.    Piazza deposited the insurance check for $967,482.39 in its bank account on or about February 3, 2023. Piazza thus deposited the check two days after its

---

[71] Testimony of Barbara Hirsch.
[72] ECF No. 96 Uncontested Material Facts, p.
[73] Pl. Ex. V.
[74] Testimony of Barbara Hirsch.
[75] Uncontested Material Facts, p; *see also* Pl. Ex. V.

attorney had responded to BlueTeam's Demand Letter and over one month after Piazza had received the check from its insurer.[76]

57.    Ms. Hirsch testified that Piazza did not deposit the check sooner because the check was made out to a Piazza entity that did not own Piazza's building. After speaking with the bank, Piazza was able to use the funds as a curtailment on the mortgage. The bank would release back the funds for building repairs only.[77]

58.    On March 15, 2023, BlueTeam filed a complaint asserting breach of contract and an alternative claim for unjust enrichment against Piazza (the "Original Complaint").[78] The Original Complaint described BlueTeam as the "successor-by-assignment to Sendero Restoration Services, LLC" and stated that "[i]n conjunction with its purchase of the assets of Sendero Restoration Services, LLC" BlueTeam "was assigned and assumed . . . the September 14, 2021 Restoration Services Agreement referenced herein."[79]

59.    Piazza filed an Answer to the Original Complaint that denied the allegations. Attaching its February 1, 2023 Response Letter as an exhibit, Piazza stated that "[u]ndersigned counsel responded with a letter outlining why plaintiffs were not entitled to the recovery they seek" due to the contract's assignment to BlueTeam.[80]

---

[76] ECF No. 96 Uncontested Material Facts, n.
[77] Testimony Barbara Hirsch.
[78] ECF No. 1.
[79] ECF No. 96; Uncontested Material Facts, s.
[80] ECF No. 9 at 2; ECF No. 9-1.

17

60.     BlueTeam—now aware for the first time of Piazza's stance that Piazza had terminated the Restoration Contract for good cause due to the contract's supposed assignment—filed, with Piazza's consent, a First Amended Complaint. The First Amended Complaint added Sendero as a plaintiff and revised the language that Sendero had "assigned" the contract to BlueTeam. Instead, the First Amended Complaint stated BlueTeam was "assigned the task of completing" the Restoration Contract.[81]

61.     Several months later, Plaintiffs BlueTeam and Sendero filed an unopposed motion seeking leave to amend the complaint once again.[82] This time, Plaintiffs sought to "clarify that Sendero Restoration Services, LLC remained responsible for the agreed upon restoration work to property owned by [Piazza]." The Court granted the motion and admitted the Second Amended Complaint, which clarifies that "Sendero remained responsible for providing the services under the Contract, while BTR (BlueTeam) was permissibly subcontracted to perform services under the Contract."[83]

## III.    CONCLUSIONS OF LAW

1.     The Court has diversity jurisdiction under 28 U.S.C. § 1332, because the parties are citizens of different states and the matter in controversy exceeds $75,000.

---

[81] ECF No. 96 Uncontested Material Fact, s; ECF No. 12 (unopposed motion for leave to file First Amended Complaint); ECF No. 14 (First Amended Complaint).
[82] ECF No. 96 Uncontested Material Fact, u.
[83] *Id.* Uncontested Material Fact, v.

2.      The Restoration Contract contains a Texas choice-of-law provision.[84] The parties have jointly stipulated Texas law shall govern the dispute between Piazza and Sendero.[85] Where, as here, the Court's jurisdiction is based on diversity of citizenship, the Court applies the substantive law of the forum state, Louisiana. *See Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014). Under Louisiana law, contractual choice-of-law provisions are valid unless the chosen law contravenes the public policy of the state whose law would otherwise apply. La. Civ. Code art. 3540. No party has contested the validity of the Restoration Agreement's choice of Texas law to govern their agreement. Nor has any party argued that enforcing the provision would contravene the public policy of any state. Thus, the parties' choice of Texas law to govern their agreement applies to the breach of contract claim.

3.      The parties do not dispute that they entered into a valid, enforceable contract under Texas law. *See Arshad v. Am. Express Bank, FSB*, 580 S.W.3d 798, 804 (Tex. App. 2019).

4.      In construing a contract under Texas law, the court's role is to "ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). "This analysis begins with the contract's express language." *Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018), *as corrected* (Nov. 30, 2019). "We 'give terms their plain, ordinary, and generally accepted meaning unless the instrument

---

[84] Pl. Ex. 1 § 8.
[85] ECF No. 44 (Joint Pretrial Stipulations).

shows that the parties used them in a technical or different sense.'" *Id.* (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

5.      "'If the Court determines that the language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous and we will construe it as a matter of law.'" *Crane v. Rave Rest. Grp., Inc.*, 2023 WL 3735567, at *3 (5th Cir. May 31, 2023) (*per curiam*) (quoting *Alicea v. Curie Bldg., L.L.C.*, 632 S.W.3d 142, 153 (Tex. App.—El Paso, no pet. h.)). "'However, if the provision contains more than one reasonable interpretation, it is ambiguous and creates an issue of fact.'" *Id.* (citation omitted).

6.      The Restoration Contract provides for the customer, Piazza, to elect to terminate the contract if it so chooses:

> Customer may terminate this Agreement, if good cause is determined, such as in the event that Sendero *substantially breaches* the terms of this Agreement. If Customer cancels this Agreement, without good cause, the Parties agree that Sendero would be entitled to liquidated damages for its out-of-pocket expenses and lost profits.[86]

7.      The Restoration Contract does not define "good cause" or "substantially breaches."[87]

8.      The contract does not expressly state whether breach of Section 7, which provides that "[n]either party may sell, assign, transfer, convey, pledge, encumber or otherwise dispose of this Agreement, or any of the rights or duties under this

---

[86] Pl. Ex. 1 § 6.1 (emphasis added).
[87] *See generally id.*

20

Agreement, without the prior written consent of the other party, which shall not be unreasonably withheld or delayed," constitutes a substantial breach of the contract.

9.    Under Texas law, a party is only discharged from its obligation to perform under a contract where there has been a "material" breach by the other party. *U.S. Enercorp, Ltd. v. SDC Montana Bakken Expl., LLC*, 2015 WL 1310359, at \*7 (W.D. Tex. Mar. 24, 2015) ("Under Texas law, a party's obligations to perform under a contract are *only* discharged upon breach by the other party if the breach is material.") (citing *Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 753 (Tex. 2013) (emphasis added)).

10.    When a party commits a nonmaterial breach, however, the other party "'is not excused from future performance but may sue for the damages caused by the breach.'" *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (citation omitted).

11.    Whether a breach is material is a question of fact. *See Matter of Dallas Roadster, Ltd.*, 846 F.3d 112, 127 (5th Cir. 2017).

12.    As noted, Section 6.1 of the Restoration Contract permits Piazza to terminate the contract without paying liquidated damages "if good cause is determined, such as in the event that Sendero substantially breaches the terms of this Agreement."[88]

13.    The Court finds that the Restoration Contract's "substantially breaches" language tracks Texas law's rule that a party is only discharged from its obligation

---

[88] Pl. Ex. 1 § 6.1.

to perform under a contract where the other party "material[ly] breach[ed]" the contract. *U.S. Enercorp*, 2015 WL 1310359, at *7.

14.     In other words, the Court finds that a "substantial[] breach[]" under the Restoration Contract is tantamount to a "material" breach under Texas law. *See id.* The Court notes that neither party objected to this understanding at closing argument. Instead, both parties agreed "substantial breach" and "material breach" are synonymous terms.

15.     The Court therefore finds that if Piazza elects to terminate the Restoration Contract for "good cause," it must show Sendero "materially" breached the Restoration Contract.

16.     In *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 199 (Tex. 2004), the Supreme Court of Texas listed "five circumstances significant in determining whether a failure to perform is material." The five factors are:

a.  the extent to which the injured party will be deprived of the benefit which he reasonably expected;
b.  the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
c.  the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
d.  the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances;
e.  the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.*

17.    Recall that Piazza maintains it terminated the Restoration Contract for the first time in the February 1, 2023 Response Letter (and not on the January 13, 2023 call). The Court, however, found that Piazza terminated the contract on the January 13, 2023 call.[89] *See supra.*

18.    Even if Piazza did not cancel the contract on the January 13 call and instead first cancelled the contract in the February 1, 2023 Response Letter, however, the Court concludes that Plaintiffs did not commit a material breach under the *Mustang Pipeline,* 134 S.W.3d at 199 factors that would justify Piazza's February 1, 2023 cancellation. *See id.*

19.    Piazza's stated reasons for its termination of the Restoration Contract— that is, its purported reasons Sendero materially or substantially breached the contract—include: (1) the January 18, 2023 Demand Letter implying Sendero had assigned (rather than subcontracted) the Restoration Contract to BlueTeam; (2) the change in personnel at Sendero/BlueTeam, including the departure of Piazza's preferred contacts (Cy Bellamy and Ryan Cowles) and Ms. Hirsch's personal dislike of Mr. Scott; (3) the pressure tactics Mr. Scott and others at Sendero/BlueTeam supposedly asserted on Piazza to schedule the repair work; (4) Mr. Scott and Sendero/BlueTeam's supposed refusal to answer Piazza's outstanding questions.

---

[89] Considering the five *Mustang Pipeline* factors, the Court concludes that Sendero/BlueTeam did not commit a material breach before January 13, 2023. *See id*. The Court thus finds that Piazza did not have "good cause" to terminate the Restoration Contract when it cancelled the contract on January 13, 2023. Because the Court finds that Piazza did not have good cause to terminate the contract even after receiving the January 18, 2023 letter, however, the Court need not analyze whether Piazza had "good cause" to terminate by way of a "material breach" by Sendero/BlueTeam under *Mustang Pipeline* prior to the January 13, 2023 call.

20.     The Court finds that Piazza's purported reasons for termination fail to show that Sendero/BlueTeam committed a material breach of the Restoration Contract under the *Mustang Pipeline* factors that would provide it "good cause" to terminate for the following reasons:

21.     **The January 18, 2023 Demand Letter:** Neither Ms. Hirsch nor Mr. Piazza could explain how the January 18, 2023 Demand Letter (which implied the Restoration Contract had been assigned to BlueTeam) deprived Piazza of a reasonably expected benefit. *See Mustang Pipeline*, 134 S.W.3d at 199. True, the Demand Letter implied there may have been a technical breach of the contract's written-permission requirement for assignment of the contract. But under the Restoration Contract, Sendero could subcontract the work without written permission from Piazza.[90] And Ms. Hirsch repeatedly testified that she did not have an issue with BlueTeam in general, nor with BlueTeam doing the repair work on Piazza's building. Ms. Hirsch did not explain how a possible assignment of the contract to BlueTeam—rather than a permissible subcontract—would deprive Piazza of a benefit.

22.     Further, Piazza did not suffer any "injury" from the deprivation of the purported benefit, because the contract was not actually assigned; rather, any implication in the Demand Letter that the contract was assigned was pure clerical error. Any potential injury to Piazza thus could have been easily rectified with clarification from Sendero/BlueTeam. In other words, there was a high likelihood of

---

[90] Pl. Ex. A § 7.

cure through reasonable assurances if Piazza had spoken to BlueTeam or sought clarification about the Demand Letter's assertion.

23. Finally, Sendero's behavior comports with the standard of good faith and fair dealing because its January 18, 2023 Demand Letter indicated it wished to honor the contract by providing Piazza with an opportunity to schedule the work. Piazza, on the other hand, showed a lack of good faith when it attempted to cancel the contract in the February 1, 2023 Response Letter without providing Sendero an opportunity to cure or to clarify the assignment issue. The January 18, 2023 Demand Letter thus was not a material breach by Sendero and did not provide Piazza with any "good cause" to terminate the contract. *See id.*

24. **Personnel at Sendero/BlueTeam**: Ms. Hirsch testified that she had an issue with specific people (namely, Mr. Scott), who became more involved with the performance of the Restoration Contract towards the end of 2022. According to Ms. Hirsch, she preferred to work with other personnel at Sendero/BlueTeam, namely, Cy Bellamy and Ryan Cowles. Under the *Mustang Pipeline* factors, Ms. Hirsch's issues with specific personnel at Sendero/BlueTeam do not rise to the level of material breach. The Restoration Contract contains no language guaranteeing certain employees would be staffed on Piazza's job. Ms. Hirsch did not have a reasonable expectation that Piazza could avoid working with Mr. Scott—he is the owner of Sendero and was involved in the contract negotiation from the beginning. Moreover, even if Piazza's contract had been assigned from Sendero to BlueTeam (rather than subcontracted), Mr. Scott would have remained involved: he remained the owner of

25

Sendero while also an employee of BlueTeam after the asset purchase.[91] Ms. Hirsch testified that she never vocalized her issues to anyone at Sendero or BlueTeam about Mr. Scott. Nor did she request to work with other personnel at Sendero/BlueTeam.[92] A party's unvoiced personal preference to avoid working with certain specific people employed by a contractual counterparty does not constitute material breach on the counterparty's part. *See id.*

25.    **Pressure Tactics/Outstanding Questions:** Any supposed pressure that Mr. Scott exerted on Ms. Hirsch and Mr. Piazza to move forward with scheduling the repair work does not constitute a material breach on Sendero's part. Under the terms of the contract, Piazza was required to schedule the work "within thirty (30) days of Customer's receipt of any payments from the insurance carrier[.]"[93] The appraisal award was issued in November 2022.[94] Ms. Hirsch admitted that she received the check with the full balance of $967,482.39 from the insurer's adjuster in late December.[95] Ms. Hirsch also admitted she was not ready to schedule the work in January. The exhibits reveal that Mr. Scott was making courteous attempts to move forward with the contract in good faith around this time, including scheduling a preconstruction meeting and asking for clarification of Piazza's preferences for the roof.[96] Mr. Scott's attempts to move forward with the contract's terms—and Ms. Hirsch's and Mr. Piazza's reluctance to do so—is not a deprivation of an expected

---

[91] Testimony of Vaughn Scott.
[92] Testimony of Barbara Hirsch.
[93] Pl. Ex. A § 3.
[94] Testimony of Barbara Hirsch; Vaughn Scott.
[95] Testimony of Barbara Hirsch.
[96] Pl. Ex. R; Ex. K46-50.

benefit for Piazza. Rather, it shows Piazza was failing to perform under the contract's terms—not Sendero. In addition, the Court found Mr. Scott's testimony more credible on this issue due to Mr. Scott's forthcoming demeanor, in contrast to Ms. Hirsch and Mr. Piazza's vague answers regarding issues with the project.

26.    In sum, Sendero has successfully shown by a preponderance of the evidence that Piazza terminated the Restoration Contract without "good cause" because Sendero did not materially or substantially breach the contract. Piazza therefore owes Plaintiffs $566,791.35 in liquidated damages for their breach of contract claim.

27.    In their complaint, Plaintiffs also request attorneys' fees under Section 6.2 of the Restoration Contract.[97] The parties have not engaged in briefing or argument regarding Plaintiffs' entitlement to attorneys' fees.[98] The Court finds that Plaintiffs are not entitled to attorneys' fees under the language of the Restoration Contract. The Court acknowledges that Section 6.2 provides that "[i]n the event Sendero is required to seek the services of an attorney to collect *these payments*, [Piazza] will pay for the reasonable and necessary attorneys' fees and costs attributable to such legal proceeding.[99] But "these payments" refers to payments sought by Sendero pursuant to Section 6.2, which Sendero can pursue only in the event "*Sendero* [] terminate[s] this Agreement" and are limited to "any past-due

---

[97] ECF No. 32 ¶¶ 25-26.

[98] *See, e.g.*, ECF Nos. 48 (Plaintiffs' motion for partial summary judgment); 49 (Defendant's motion for summary judgment); 103 (Plaintiffs' proposed findings of fact and conclusions of law); 104 (Defendant's proposed findings of fact and conclusions of law).

[99] Pl. Ex. A § 6.2 (emphasis added).

payments for work done and materials provided."[100] Plaintiffs, however, have consistently sought liquidated damages under Section 6.1 of the contract, which applies only if *Piazza* terminates the agreement, and does not provide for attorneys' fees. The Court has already found that Plaintiffs are entitled to liquidated damages under Section 6.1. The Court accordingly finds that Plaintiffs are not entitled to attorneys' fees under Section 6.2 of the Restoration Contract.

## IV.    CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court finds that Piazza is liable to Plaintiffs for $566,791.35 in liquidated damages. Plaintiffs' alternative claim of unjust enrichment is dismissed. The Court hereby renders judgment to that effect.

New Orleans, Louisiana, this 30th day of March, 2026.

_____
BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[100] *Id.* (emphasis added).